Robert R. BRADLEY, et al., Plaintiffs,

v.

BROWNING–FERRIS INDUSTRIES, INC., et al., Respondents,

and

Lincoln Brothers Land, Inc., Appellant.

No. WD 40945.

Missouri Court of Appeals, Western District.

Nov. 14, 1989.

Bruce G. Heavner, G. Edwin Proctor, Jr., Kansas City, for appellant.

William G. Beck, Sue M. Honegger, Kansas City, for respondents.

Before LOWENSTEIN, P.J., and KENNEDY and GAITAN, JJ.

LOWENSTEIN, Presiding Judge.

The ultimate issue tried here was whether, pursuant to a contract, the operator of a landfill, the respondent, had a right to take dirt from the appellant landowner's property adjoining the plot used for the dumpsite.

This is a cross-claim which arose from the filing of a suit in 1983 by surrounding landowners against both appellant Lincoln Brothers (Lincoln) and respondents Browning–Ferris Industries, et al., (BFI). The surrounding landowners' claims were eventually settled, leaving only the cross-claim between Lincoln and BFI. A jury found BFI had a contractual right to use 502,000 cubic yards of dirt as landfill cover.

In 1972, Lincoln and BFI's predecessor, Landfill, Inc. executed a written contract (Landfill Operating Agreement) under which Landfill operated a sanitary landfill and hazardous waste facility on Lincoln's approximately 196–acre property near Missouri City in Clay County. The original contract was for ten years, however, it was modified four times with the last agreement expiring on March 1, 1983. During this ten to eleven year operational period, approximately fifty-four acres of land was actively used in waste management (referred to as the southern portion), while the northern portion remained untouched.

In 1983 BFI closed the landfill to any further refuse. Federal and Missouri regulations in effect required certain "closure" activities when a landfill stopped receiving wastes. The most significant of these was the construction of a "final cover" over the facility. After preparing and securing approval of a closure plan calling for a dirt cover, in June 1985 BFI began implementation of the plan by going on the northern portion of Lincoln's property to remove dirt for the cover.

Lincoln immediately moved for a temporary and permanent injunction to stop the removal. The trial court entered a temporary order in favor of Lincoln. After an evidentiary hearing, the court issued an order on July 30, 1985 concluding the Landfill Operating Agreement entitled BFI to use all of the property for final cover dirt to the extent "necessary, useful or appropriate" in implementing the closure plan. BFI proceeded with closure of the landfill pursuant to the order of the trial court which was not appealed by Lincoln. Trial on this cross claim then started in April, 1988. In what was described at oral argument as the longest civil trial in Clay County history, a jury found for BFI, and Lincoln filed this appeal. In its petition Lincoln feared it 1) would suffer liability for negligent operation and closing by the operator, and 2) that it suffered extensive damage to its tract by the unauthorized taking of soil by the operator to cover the fill. The cross-claim included counts for contractual indemnity, waste fraud, nui-

sance, negligence, negligence per se, prima facie tort, breach of contract, trespass, *res ipsa loquitur*, unjust enrichment and intentional tort. Several of these counts along with punitive damages claims fell to directed verdicts. The case boiled down to presenting to a jury whether or not the operator had a right to take the dirt, and if so, the value. On appeal, the points dealing with many of these counts have been stricken.

## I.

■ Lincoln argues the trial court erred in failing to grant a new trial in that the jury verdict was against the law and weight of the evidence. "If a trial court refuses to grant a new trial on the ground that the verdict is against the weight of the evidence, appellate courts will not pass on the weight of the evidence." *Veach v. Chicago and North Western Transportation Co.,* 719 S.W.2d 767, 769 (Mo. banc 1986). The verdict will not be overturned unless there is a complete absence of probative facts to support the verdict, viewing the evidence in the light most favorable to the verdict. *Massey–Ferguson Credit Corp. v. Black,* 764 S.W.2d 137, 145 (Mo. App.1989); *Treon v. Hayes,* 721 S.W.2d 789, 791 (Mo.App.1986).

In the present case, the jury was shown the entire Operating Agreement along with the subsequent amendments and also was subjected to testimony concerning BFI's attempt at purchasing surrounding land to use as final cover. As will be discussed *infra,* it is most questionable why this parol testimony was allowed in evidence. But even this evidence which helped Lincoln's cause, did not persuade the jury to believe BFI had no right to use the northern portion of the property as final cover. It cannot be said there was a complete absence of probative facts to support the verdict. *Massey–Ferguson, supra.*

■ The disturbing aspect of this point which was not alluded to by either party is why the jury was even involved in this determination. The Landfill Operating Agreement, the contract in dispute, is not ambiguous and therefore the entire issue

should have been taken from the jury and disposed of by the trial judge. *Harris v. Union Electric Co.*, 622 S.W.2d 239, 247 (Mo.App.1981). "Where there is no ambiguity in the contract the intention of the parties is to be gathered from it and it alone, and it becomes the duty of the court and not the jury to state its clear meaning." *Edgewater Health Care v. Health Systems*, 752 S.W.2d 860, 865 (Mo.App. 1988). Courts determine what the parties intended by what they said, not by what they might have said or what perhaps they should have said. *L & K Realty Co. v. R.W. Farmer Construction Co.*, 633 S.W.2d 274, 280 (Mo.App.1982).

In the instant case, the Landfill Operating Agreement reads in pertinent part:

> Owner is the owner of the parcel of land of approximately 206 acres ... such land being sometimes herein called the *"property."*

> \* \* \* \* \* \*

> Operator shall be entitled to the use of *all* of the *property* when and to the extent necessary, useful or appropriate for the conduct of its landfill operations.

(Emphasis added).

Although there were subsequent amendments, the controlling sections of the Agreement were not affected.

Looking at the document, the word "property" is a defined term within the contract meaning the entire acreage involved. Lincoln gave BFI permission to use *all* of the *property* to conduct landfill operations. However, this does not end the matter. Lincoln contends the Landfill Operating Agreement had expired by the time BFI took the dirt, therefore, even if the Agreement was not ambiguous, it is not controlling. This contention is against the clear meaning of the Agreement. Although the final amendment expired on March 1, 1983, there is language in the original Agreement which extends its application well beyond this date.

> Operator shall ... be responsible for the grading, final cover and seeding.

> \* \* \* \* \* \*

Operator shall comply with all applicable ordinances, statutes and other governmental rules and regulations.

The date of March 1, 1983 was the expiration date for accepting waste and operating the dump, while the above stated language controls the actual closing of the landfill. These are two distinct areas covered by the same Agreement. Even when the original Agreement was signed in 1972, regulations mandated final cover over a landfill which stopped receiving wastes. The Missouri Division of Health specified final cover of not less than twenty-four inches and the implementation of a maintenance program until the fill stabilized. Lincoln apparently knew of this regulation because it was alluded to in the Agreement. It is ridiculous for Lincoln to assert BFI had to comply with these regulations before closure on March 1, 1983. In fact, it would be impossible to do so. No doubt if BFI refused to conduct the final cover operation Lincoln would not hesitate to use the Agreement in their favor. Lincoln cannot now try to shorten the term of the Agreement to suit its own purpose.

**II.**

Lincoln asserts the trial court erred by not directing a verdict in its favor. However, it never moved for a directed verdict on its cross-claim against BFI—the point is therefore not preserved for appellate review. *Crystal Tire Co. v. Home Service Oil Co.*, 525 S.W.2d 317, 320–21 (Mo. banc 1975); *see also Sab Harmon Ind. v. All State Building Systems*, 733 S.W.2d 476, 487 (Mo.App.1987). Even if preserved, the point would be without merit.

**III.**

Lincoln asserts the trial court erred in allowing the Order of July 30, 1985 to be read, shown and passed to the jury in that it was not relevant and highly prejudicial. This is the order which allowed BFI to take dirt from the northern portion of the property for use in final cover. It read in part:

> The court finds and concludes that the contracts among ... [Lincoln and BFI]

... do permit ... [BFI] to use as much of the entire ... tract owned by ... [Lincoln] ... as is "necessary, useful or appropriate" to the implementation of the approved closure plan....

The trial court admitted the order into evidence for many reasons: 1) it was evidence that BFI was authorized to take and use the dirt for final cover; 2) it was relevant as to whether the dirt actually taken by BFI was "necessary, useful or appropriate" in that the order authorized a grievance procedure Lincoln was to follow if it felt BFI was abusing the court's order, a procedure which Lincoln never .utilized; 3) the order was used to rebut Lincoln's claim that BFI was trespassing on its property; and 4) it was used to defend against Lincoln's punitive damage claim. The court finds these reasons sufficient to justify the admittance of the order into evidence. "[A] determination that the probative value of certain evidence outweighs any potential unfair prejudice is ... a matter within the discretion of the trial judge." *Smith v. Firestone Tire and Rubber Co.*, 755 F.2d 129, 134 (8th Cir.1985); *see also Weisbach v. Vargas*, 656 S.W.2d 797, 800 (Mo.App. 1983); *Gant v. Hanks*, 614 S.W.2d 740, 744 (Mo.App.1981). The fact that Lincoln withdrew its trespassing and punitive damage claims is irrelevant. Lincoln argued these claims until it became apparent BFI would use the order in rebuttal, then withdrew them, thereby gaining the advantage of having its evidence before the jury and precluding BFI from presenting its own.

Although not raised, the Order of July 30, 1985 denying Lincoln's permanent injunction may have amounted to *res judicata*, or collateral estoppel as to this cross-claim. *Patterson v. Null*, 751 S.W.2d 381, 386 (Mo.App.1988). The issue in both proceedings was the construction of the Landfill Operating Agreement, the Order of July 30 is a judgment on the merits, *see State ex rel. State Highway Commission v. Finch*, 664 S.W.2d 53, 54 (Mo.App.1984); *St. Louis County v. Police Officers Association*, 652 S.W.2d 142, 144 (Mo.App.1983); *Frimel v. Humphrey*, 555 S.W.2d 350, 352 (Mo.App.1977), the parties are the same, and Lincoln had a full and clear opportunity to litigate the issue at the injunction hearing.

## IV.

■ Lincoln asks for a new trial because of the trial court's failure to allow it to read to the jury testimony of a Mr. White taken at the 1985 injunction trial which culminated in the July 30th Order. White, either prospectively or as BFI's agent, was seeking the dirt to actually provide the cover. He contacted one of the principals of Lincoln to buy the dirt. Although the law of contracts shuns the use of extrinsic evidence as to clear terms, *supra*, Lincoln argues its "position is that this evidence is highly probative of their position that no contractual right existed on the part of Respondents to take Appellant's dirt. Otherwise, why would their own contractor be attempting to purchase a Clay County farm to excavate dirt."

Even assuming the rejection of the offer of this evidence to have been incorrect the error would have been harmless. Rule 84.-13(b). The jury had before it other evidence BFI had, at one time, made efforts to buy the dirt elsewhere. Reversible error was not committed in excluding cumulative evidence. *Hamsome v. Northwestern Cooperage Co.*, 679 S.W.2d 273, 276 (Mo. banc 1984). Exclusion of this evidence did not materially affect the outcome of this case. *Pratt v. Cudworth*, 637 S.W.2d 720, 721 (Mo.App.1982).

## V.

■ Lincoln's next point claims error for the reason the jury was not instructed on Lincoln's theory of unjust enrichment. It is baffling as to how Lincoln expected to recover on this theory, since there was clear contractual language plus a prior judgment expressly allowing BFI to do what it did. Lincoln returns to its argument that the contract expired when BFI decided to not accept refuse, and therefore no contract was in effect when the 1985 dirt for the cover was taken. The written contract refutes this contention, for if it were as Lincoln argues, BFI could have

walked away from the fill and left compliance with state and federal closure statutes up to Lincoln. The point is denied.

## VI.

■ Lincoln also contends the jury was misled and confused because nine withdrawal instructions were given—"[T]he cumulative effect was to leave the jury with the impression that all of appellant's evidence should be disregarded." The basic questions of whether instructions are confusing is addressed to the trial court's discretion. *Affiliated Foods, Inc. v. Strautman*, 656 S.W.2d 753, 759 (Mo.App.1983). Under MAI 34.01 (1981) the use of withdrawal instructions is to avoid misleading the jury on a specious issue, *Weisbach v. Vargas, supra,* at 799, and the giving or refusal of these instructions is again up to the discretion of the judge. *Id.* That certain evidence favorable to Lincoln was before the jury and then the issue abandoned gives perfect ground for the withdrawal instructions and a lack of showing of prejudice for a reversal.

Basically, despite the fact Lincoln filed a welter of counts for removal of dirt, by the time the case was submitted, Lincoln wanted recompense for the quantity of dirt taken from the northern portion of the tract, and to be relieved of liability as landowner for damages due to BFI's possible negligent closure of the dump. Many of Lincoln's points including those on liability have been improperly presented in its amended brief. The appellant's brief spends some twenty-seven pages in discussing nineteen points. Thirteen of those points contain no citation of authority. *Thummel v. King*, 570 S.W.2d 679 (Mo. 1978). In several points the point itself takes more space than the supporting argument. Many of these points do not state wherein or why the rulings were incorrect. *Big Valley, Inc. v. First National Bank*, 624 S.W.2d 193, 194 (Mo.App.1981). The requirements of Rule 84.04(d) are mandatory. *Black v. Cowan Construction Co.*, 738 S.W.2d 617, 619 (Mo.App.1987). These arguments in violation of the Rule present nothing for review, *In Interest of B.L.E.*, 768 S.W.2d 86, 93 (Mo.App.1988), and are deemed abandoned. *Boswell v. Steel Haulers, Inc.*, 670 S.W.2d 906, 912 (Mo. App.1984). In addition, several points do not point out the correct rule the court should have applied. *Hoffman v. Koehler*, 757 S.W.2d 289, 292 (Mo.App.1988). This court deems insufficient: 1) point II dealing with the passing of a special instruction to the jury; 2) points V and VIII dealing with withdrawal instructions; 3) points XI, XII and XIII which allege error in verdicts being directed against Lincoln on the counts constituting contractual indemnity, fraud, nuisance, negligence, negligence per se, prima facie tort, trespass, *res ipsa loquitur* and intentional tort. The total argument for reinstatement of all those counts is done in 27 lines in the brief, with only two references to the transcript to uphold Lincoln having made a submissible case, all made without citation of authority. Any point not developed in the argument portion of the brief is not properly presented for review. *Bopp v. Spainhower*, 519 S.W.2d 281, 286 (Mo. banc 1975); 4) point XIX dealing with a withdrawal instruction which comprises three lines of argument *sans* citation or transcript reference; and 5) points XIV through XVIII dealing with various allegations of instructional error contain only one case citation in point XVI which is applicable. It should be pointed out that all the points now stricken, even if properly presented, would not have changed the outcome of this case.

## VI.

■ Finally, the court examines what is probably the most preposterous of the points raised by Lincoln which seeks a reversal for use of non–MAI instructions on computation of property damage. Lincoln is correct in stating MAI 4.02 on computation of damages should have been submitted. This instruction tells the jury if it finds for the plaintiff, to find from the evidence the difference in the fair market value as between "before" and "after" the damage, plus any loss of use. The damage instructions given here were based on "the fair market value of the dirt at the time it was moved."

The following list of reasons, which by no means is complete, make this point frivolous:

1) The only evidence presented by Lincoln on damages was a figure based on a value of the dirt at between $3 and $6 a cubic yard multiplied by the 502,000 cubic yards taken by BFI.

2) BFI objected to the "value of the dirt" instructions, saying the before and after measure standard was applicable.

3) Lincoln did not object to the instructions it now finds amount to error. *Goff v. St. Luke's Hospital of Kansas City,* 753 S.W.2d 557, 565 (Mo. banc 1988); *Reece v. Missouri Delta Bank,* 710 S.W.2d 21 (Mo. App.1986); *Crank v. Firestone Tire & Rubber Co.,* 692 S.W.2d 397, 401–02 (Mo. App.1985).

4) The jury in finding for BFI never reached the issue of damages. *Crank v. Firestone,* 692 S.W.2d at 401; *Reece,* 710 S.W.2d 21, 23. This point is denied.

The judgment is affirmed.